CARY and others *v.* DOMESTIC SPRING-BED Co. and others.[1]

*(Circuit Court, D. New Jersey. January 6, 1886.)*

1. PATENTS FOR INVENTIONS—PRELIMINARY INJUNCTION.
   No new facts appearing from defendant's affidavit, a preliminary injunction was granted in this case, without an examination of the merits or any expression of opinion upon the validity of the patent; following the ruling in *Cary v. Wolff*, 24 Fed. Rep. 139.

2. SAME—MOTION TO DISSOLVE PRELIMINARY INJUNCTION.
   Upon a motion to dissolve the preliminary injunction, the defendants conceded the utility of the invention, but sought to show by affidavits that the patentee was not the first inventor. The court, not deciding that such evidence was conclusive as to the prior use, held that it was of a character to suggest grave doubts on this point, and dissolved the injunction.

3. SAME—RULE AS TO DISSOLVING INJUNCTIONS.
   It is a good rule that evidence which would prevent the issuing of an injunction ought to be regarded as sufficient to dissolve one already granted.

In Equity.

*Mr. Collins* and *Mr. Keasbey*, for defendants.

*Mr. Duncan* and *Mr. Witter*, for complainants.

NIXON, J. The validity of the complainant's patent was passed upon and sustained by his honor, Judge WHEELER, in the case of *Cary v. Wolff*, 24 Fed. Rep. 139, pending for several years in the circuit court of the United States for the Southern district of New York. Judge ACHESON, in the Western district of Pennsylvania, followed Judge WHEELER, and granted to the complainant a preliminary injunction. 24 Fed. Rep. 141. An application was then made to this court, in July last, for a provisional injunction, and finding that no facts were revealed by the affidavits which had not been considered by the learned judge in the *Wolff Case*, I ordered the injunction, without an examination of the merits, or expressing any opinion upon the validity of the patent.

The defendants now introduce a number of new affidavits, relating to the novelty of the invention, and move to vacate and dissolve the injunction heretofore granted. They seem to occupy new ground. They acknowledge the value of Cary's alleged invention; concede, as the patent claims, that, in the operation of coiling the wire into springs, the metal is weakened by disturbing the molecules,—the outer portion of the coil being drawn or stretched, and the inner portion crushed or shortened,—and admit that the elasticity and strength, lost by the distortion, is more than restored by subjecting the spring, for a few minutes, to a degree of heat known as "spring-temper heat." They claim, nevertheless, that Cary has been anticipated in the discovery that spiral springs are improved in elasticity by such a process; and that the fact was known, and the process in public use,— by the affidavits,—some years before he claims to have discovered and used it.

[1] Reported by Charles C. Linthicum, Esq., of the Chicago bar.

In considering the application, I have confined myself mainly to the testimony of the three employes of the American Spiral Spring Butt-hinge Company, to-wit, John I. Riker, and John and Joseph R. Pereira.

Mr. Riker says that in 1864 he became the foreman of the American Spiral Spring Butt-hinge Company, then carrying on its business in Jersey City; that they manufactured spiral springs in connexion with butt-hinges; that he was in the continuous employ of the company from 1864 to 1875, either as foreman or superintendent, and was thoroughly acquainted with all its manufacturing operations, and conducted them; that he studied the best means of tempering the springs after they were completed, and early learned that it injured their quality to heat them, beyond a blue color, to a red heat; that for several years he was in the habit, after heating the springs, to plunge them into an oil-bath, supposing that it was necessary in order to impart to them a good, even, elastic temper; but that in the year 1867 or 1868 (certainly before 1870) he had some springs, on which some japan had accidentally dropped, and which he put into the furnace to burn off, and found their quality improved, although he had not cooled them in the oil-bath mixture. "This," he continues, "led us to experiment, and we found that the heating alone caused the increase of elasticity, and that the cooling was not necessary. Therefore, we discontinued the use of the [oil] mixture on the springs, and simply heated them to a blue color, and let them cool off in the air."

John Pereira testifies that he was employed in 1864 as a workman in the same company, while Riker was foreman, and has remained in their employ ever since; that he was familiar with all departments of their business, and at present has the charge of their factory as superintendent. He states in his affidavit the incident to which Mr. Riker refers, from which they learned that the increased elasticity of the spring arose from the mode of heating, and not to the cooling in the oil-bath. He says that some years before 1870, and, as near as he can recall, in the year 1867 or 1868, they put some butts in the oven, with the springs in, to burn off some japan, which had dropped on them, and to his surprise he ascertained that the springs were not ruined, but were better than before. They learned from experiment that heating the springs to a spring-temper heat and to a blue color improved their elasticity, and that such heating was the best process for tempering, and that they have continued such process more or less ever since.

His brother, Joseph, swears substantially to the same effect. He says:

"About 1867, and before the japanning oven was built, we had some springs that got japan on. It was necessary to take off the japan, and so we burned it off by putting them on a plate over the fire. They were heated enough to burn off the japan, and not to a red heat. I supposed that the temper would

be taken out by the heating, but on testing we found that they were improved by the heating, although they had not been dipped in the oil. This led us to experiment, and we heated a lot of soft springs until they were blue, and let them cool off without any bath, and found that they were improved. After this we tempered many of our springs in this way. Sometimes, when the wire was very soft, we put them in the oil mixtures, but generally we left them to cool in the air. This we practiced frequently before the year 1870. I think we began it in 1868, and I am sure it was before 1870. We have continued to practice it ever since on springs requiring tempering."

It does not appear that such testimony of the prior discovery, knowledge, and use of the invention was brought to the notice of either of the learned judges who granted the injunction in the other cases. I do not say that it is conclusive. A cross-examination may throw a different light on the matter. But it is certainly of a character to suggest grave doubts whether Cary was in fact the original and first discoverer of the beneficial results which followed the application of spring-temper heat to springs, whose value so largely depends upon their elasticity and strength. I do not think that I should have seen my way clear to allow the preliminary injunctions in the present case if it had been presented on the original motion; and the rule is a good one, that the evidence which would prevent the issuing of an injunction ought to be regarded as sufficient to dissolve one already granted.

The injunction must be dissolved until the final hearing.